Good morning, everyone. The case being argued this morning related to a case we heard a while ago. It's number 2011-13-34, Aventis Pharma v. Dr. Reddys Labs. Mr. Berghoff. Thank you, Your Honor. The term substantially pure that's in dispute on this appeal is a relative term. One needs to understand what it is we're talking about, the purity of what. Just like drinking water, I may expect that substantially pure drinking water is quite pure. But for purposes of watering the grass on a golf course, the water in the stagnant pond filled with organisms and dirt is going to do the job. And that could be viewed as substantially pure. And the error that the district court made in this case was refusing to construe the phrase and the claim in its entirety, substantially pure regional isomer, and instead taking the word substantially pure out of context and construing them in a vacuum. It's a context that you are proposing just means pure of the meta-isomer? Yes, in two regards. That is one of two that we are. The district court focused on absolute purity and that was in error because the sole problem addressed by the specification in this case was regio-isomeric purity, was the meta-isomer. That is the only impurity that is discussed in the specification. And instead, based on the silence as to other impurities, the district court made the leap that, and we think it was an error to put any numerical limitation on the claim language, but in addition took that numerical limitation and said it had to apply to all impurities with the caveat that there could be some other elements in there such as solutions and catalysts as long as they were intended. And that, we submit, is nowhere supported in the specification because there's only one impurity and one type of impurity discussed and that's the regio-isomer that's the unwanted meta-form of the compound. And there's nothing else about any other types of purities. And what is the focus of the claim, the substantially pure regio-isomer, is a chemical intermediate. It is not a final drug product. It is never ingested by anyone. And those of skill in this art, as established by the declaration of Dr. Buchwald from MIT, those of skill in the art would understand that. They would know that you don't need an intermediate compound who only exists in somebody's plant as part of the process to end up with a different compound as the drug. That intermediate compound does not have to be 98% pharmaceutical grade purity. Everyone of ordinary skill in the art would understand that. Let me call your attention to the aspect of the record that seems to me to be the most difficult point for you to get over and that is the interference. And I'm looking at page 1632. You're very familiar with that page, I'm sure, of the appendix where your party said that one skilled in the art would have understood that the phrase substantially pure as used in claims 1 through 17 of the D'Ambra patent means that the subject compound has pharmaceutical grade purity. Now, claims 1 through 17 of the patent, which is the 610 patent, includes claims 1 through 7, which refer to substantially pure papiridine derivative compound and also claims 12 through 17, which refer to substantially pure regioisomer. It seems to me that it's difficult not to conclude from that passage that D'Ambra was saying that substantially pure refers to both, i.e. the compounds in claims 1 through 7 and also the claims in compounds 12 through 17. What's your answer? The answer is the context, which was very clear and recognized by the district court that those statements were made in the context of an interference focused on who was first to invent substantially pure fexofenadine. But let's focus, before we get to the context, the words would seem, would they not, to cover both the intermediate and the final product, because claims 1 through 17 include reference to both. They certainly do include reference to both. And that would be, when you say 1 through 17, substantially pure, as used in claims 1 through 17, we're referring to both substantially pure papiridine derivative compound and also the substantially pure regulisomer, the intermediate, right? That's what those claims refer to. That is what the claim says. It is, as we've pointed out, a product by process. Those claims, to which Your Honor is referring, were a product by process, and I think that's significant, Your Honor, because the patentability, the priority, which was the issue in the interference, of those claims devolves solely on the product. This court, of course, has changed the law in infringement cases where we look at the process steps in those claims. But at that time, and in the interference context, all that mattered was a focus on who was the first to invent substantially pure hexaphenidine, not the intermediate. So, yes, I believe... You do see the problem with the language, right? If you take that statement out of its context, which is what the district court did, and I believe that was improper, then the district court used that to justify his construction. But I believe that is improper because that statement was made entirely, 100% in the context of who was first to invent substantially pure hexaphenidine, the final pharmaceutical-grade product that is going to be ingested by humans. And that is very far, I believe, from a clear and unmistakable disclaimer or disavowal, as this court's case law requires, to limit, to put this 98% limitation onto the claim when it makes no sense from a technical standpoint or a patent standpoint for the claim before the court in this appeal. Because the claim before the court here is unlimited as to the purity of the hexaphenidine that is produced. And the district court has recognized that and there's really no dispute on that. This claim, this process claim, can be used to make hexaphenidine of any purity, full stop. There is no purity limitation for the end product. So to take a statement out of context from an interference focused on who was the first to invent highly pure hexaphenidine and import it into this claim in a different context, I think is improper and means that the claim requires that you start with highly pure intermediate to make what could be within the scope of the invention relatively impure final product. That would make no sense to a person of ordinary skill Could you turn to let's see if I can find the reference yes one of them is on there are two references in the text of the specification that have given me some pause on in terms of the reference to substantially pure as to whether substantially pure means something different with respect to the intermediate versus with respect to the final product. That's essentially what you're arguing as I understand the ultimate point that you're making to us. Yes. Now in a couple of places for example on column 18 line 4 is a reference to the process for converting substantially pure regio-isomer to substantially pure paparendine derivative compound. Correct. So your argument is that when in that single sentence the word substantially pure is used twice in close conjunction that it means something different in each of the two uses. A person of skill in the art would understand that you don't need to have the same level of purity. Well you may not need to, but the question is did you describe a process in which you were describing the same level of purity by virtue of using the same words. This is the preferred embodiment of course where we're discussing it. There are no numbers attached here. And so this does not lead to the conclusion that substantially pure regio-isomer has to be a pharmaceutical grade quality because a person of ordinary skill in the art knows that doesn't need to happen and there's no linkage, there's no reason for it. But the fact that it's the preferred embodiment doesn't really matter with respect it seems to me to the question of whether those two sets of words mean the same thing. If you're using substantially pure to mean the same thing with respect to the regio-isomer that you are with respect to the final product wherever you use it in the patent, then you lose regardless of whether this happens to be a preferred embodiment. You'd agree with that, right? If they have to mean the same thing, yes. The question is what do we infer from the use of substantially pure here and I believe there's another reference similar that they're used in the same sentence. What do we infer from that about the meaning of substantially pure whether it means something different with respect to the one versus the other. Excuse me. In answering that I'll refer to what I think are the basics and I realize I'm a little bit in my rebuttal but I'll just finish this answer if it's okay. We'll enlarge your time until we've explored these issues. Thank you. Just basic claim construction. We start with claim and that leads to a conclusion because the end product has no limitation as to its purity that there is no reason to require pharmaceutical grade purity for the intermediate and that would be in accord on the second pillar of claim construction with what a person of ordinary skill in the art would understand. The sentence, the heading from the preferred embodiment that your honor has focused on I don't believe would lead one of skill in the art to construe claim seven as requiring the intermediate to have pharmaceutical grade purity. But on that point several places in the patent starting with the first sentence of the abstract describes the present invention as a process for preparing substantially pure, prepared in derivative compound, the end product. And you do it again twice more I believe in the course of the patent you describe the present invention which is normally the preferred embodiment but to the invention as a whole. So your argument that well this patent doesn't require substantially pure end product seems to me it runs afoul of the characterizations of the present invention in the specification doesn't it? No your honor because there are other references in the specification to the end product that are not described as substantially pure. And based on that the court agreed with us that claim seven, the only claim in dispute here, is not limited to the production of pharmaceutical grade fexofenadine. So when you discuss pharmaceutical grade you're not interpreting substantially pure as meaning substantially free of the meta isomer. Is that right? You're talking about substantially free of anything else that might have gotten into the mixture during its preparation? For pharmaceutical grade materials, for the end product that's going to be ingested by a patient that is generally understood in fact I think the FDA and the USP require that it be of at least 98% purity as to all other impurities. Is it correct that the degree of I'll call it contamination with the meta isomer in the intermediate is carried forward to the final product? Yes, that's correct. So that in terms of purity of the meta contaminant isn't it the same in the intermediate and in the final product? No, Your Honor, because in very conventional manufacturing of any type of chemical, but especially a pharmaceutical, you always have clean up. So if you can get it as the defendants in this case do, if you can get your hexafenadine after your main synthesis is done in the high 80s, low 90s, you're almost there, you're almost to the finish line. Yes, you have to do some clean up steps afterwards. But if you can get rid of the meta product with clean up, then you wouldn't have all of this fuss about that they're inseparable. Well, it's all a matter of degree. If you are at a 50-50 mixture of the para and the meta isomer, that's a problem to separate. But if you have it quite high, you have mostly the good stuff in terms of hexafenadine in your final product, then chemically it's not so difficult to get rid of the remaining 10% of the isomer. The impression that I get throughout is that you couldn't separate them. You couldn't separate the piperidine derivatives. Therefore, you have to make the separation at the intermediate stage. And the amount of elimination of the meta in the intermediate stage then carries over to the final product. That's incorrect? It is correct, I believe as I framed it, to your honor in my best understanding. When in the prior art process you came out with a 1 to 2 ratio of one good to two bad, or 50-50, that is a problem, chemically, to separate. Very, very, very expensive and laborious to do. But what we learned through litigation is when the defendants take the process, the patented process, and produce in the first instance fexofenadine that's in the high 80s in terms of regio-isomeric purity or the low 90s, they don't have any. The infringement that they're charged with is in the preparation of the intermediate, is it not? The steps by which the meta and para are separated. And that's why there really is not an infringement issue in terms of the purity of the fexofenadine that they're producing using the patented process, because there is no limitation on the purity of the fexofenadine. Let me ask you a question returning to the first question that Judge Newman asked, and I wanted to make sure that I understood your answer, because it seemed to me to be an important question. Vis-a-vis the other impurities, if we were to decide that the regio-isomer purity level had to be 2%, let's see, without regard to the other possible impurities, that is to say only with regard to the meta, in other words, at least 98% para and 2% or less meta, does that help you in this case? I had understood that the problem in the case was that the accused process was using a mixture that included more than 2% of the meta. That would help us. Because you would be able still to reach the accused process once, even though you had were required to show at least 98% of the para? We believe so, Your Honor. So we would request that if Your Honors agree with us that the construction should have been in terms of regio-isomeric purity rather than absolute purity, we would respectfully ask for a vacation and remand. Okay, let's hear from the other side and would you enlarge, Mr. Berghoff, and you have something for us? Thank you. Good morning, Your Honor. By the way, just at the outset, I would just like to dispute Mr. Berghoff's conclusion or opinion that he can reach infringement with a 98% purity level. Our position is we don't But you do understand the question that Judge Newman and I were asking is vis-a-vis, impurity vis-a-vis just the regio-isomeric components, so that I guess the question is does the accused process employ a regio-isomer at 98% or higher vis-a-vis the meta? We don't believe so. You don't believe so? No, we don't. Our position in the case throughout has been no. That is, that the chemical treatment is the same, but that the result is not substantially No, we take the Our position in the litigation, to be very clear, is that we are practicing the prior art. That's our position. We use that car process and we do a series of recrystallizations that we developed that purify the compound of the meta subsequent to the formation of the litigation and we have processed documents to prove that. So just to be clear, I just wanted to make that point. I think your honors are focused on something that I think is very important in the case and Judge Newman, I think you came around to this point also when you're questioning about what was this invention really about, this inseparability. If you read what they asserted in their patent and you look at page A76 in the appendix from the 703 patent, where they talk about the prior art, and they talk about how the prior art goes through different intermediates, which they call regio-isomeric mixtures of meta and para, and then ultimately gets to the end product. And in column 4 at A76, they say each mixture would be expected to contain 33% of the para and 67% of the meta. We subsequently learned that was a mistake. It's supposed to be the other way around, 67% para, 33% meta, but this is what it says here. Since these components are inseparable, it has not been possible to obtain either of the regio-isomers and each mixture in substantially pure form. So right there they're using the word substantially pure in connection with not only the piperidine derivative end product, but also each of the intermediate regio-isomeric mixtures. But that supports their argument, does it not? The only question then is, does it have to be pharmaceutical grade and free of catalysts and free of solvents and free of everything else that you need before you give it to the patient. To the contrary, I don't believe it does support their argument, because what this establishes, I believe, is that substantially pure means the same thing in both contexts. The pure of the meta. No, I think Your Honor, there's one other... That's my question. Yes, I understand the question. Let me go on to one other point. It goes back to what Judge I don't think there's any dispute in this litigation, and I'll be very surprised to hear this, that they concede that substantially pure as applied to the end product based on the 610 interference means 98% with respect to all impurities. Indeed, I don't see how they can possibly argue otherwise. Their inventor, de Amber, submitted a declaration specifically during the interference, and let me just show you this part. Counselor, before you go there, the citation that you're reading on page 76, now, I understood that that's a description of the prior art, not the invention. That's true, but it's dealing with intermediate mixtures of regioisomers, and they're using the word substantially pure there in connection with all the mixtures. And again, let's remember what this invention was about. That was the point Your Honor raised. Not only at the beginning of the abstract do they say the present invention relates to producing substantially pure piperidine derivatives, they say it in the first sentence of the summary of the invention, and they say it again in the first sentence of the detailed description. Everywhere where they talk about what this invention is about, it's about producing substantially pure piperidine derivatives. By eliminating the metacontaminants. Exactly. And the way they do that, because they concluded that the mixtures were inseparable, the way they do that is they start with a substantially pure power CPK. So they start with a substantially pure compound from the get-go. That's how they get to a substantially pure piperidine derivative. According to them, you couldn't get there otherwise because the mixture's inseparable once you're in the end product. That's what they told the world when they wrote the patent. So that's what the invention is. But for the intermediate, why do you have to worry about solvent contaminations or other things that would make it less than 98% para? The question is what did they tell the world here? Could somebody from starting from scratch have done what Your Honor is suggesting and said, okay, all we really need to talk about here is the meta impurity? I suppose so. But that's, I have to say, that's, I don't think that's an unreasonable reading of what they say is we're getting rid of the meta and we're getting substantially pure para by purifying it at a lower stage in the process. I agree with everything you've said except I would add one additional thing and that is that they use the word, as I've pointed out, substantially pure to apply to both the para and the meta. So you think it was just sloppy writing? No, I don't think it was sloppy writing. I think they intended the word substantially pure to mean the same thing in both locations because that was their invention. That's what they saw they were going to do. They were going to take a substantially pure and make it substantially pure end product by starting with a substantially pure intermediate. And bear in mind, the cases that I've read say that when you use the same word in different locations in a patent, it's presumed to have the same meaning unless there's some clear reason not to attribute that meaning. Now when they got to the 610 prosecution and the interference they defined the word substantially pure. They attributed a definition to it. In both of those instances, substantially pure being used to have described any state that's in the prior art. No, I don't think so and I'll point out why. If you'll turn to page 1648 in the appendix. In distinguishing over certain references, particularly the Gartai's reference at the top of page 1648, they point out that this particular product had significant amounts of urine components such as steroids, lipids, fatty acids, etc. And then they go on to talk about that and at the end they say as is evident from the foregoing, the amount of impurities present in the Gartai samples, and they weren't talking just about Meta now, they say is far greater than 2%. Therefore, Gartai's TAM, which is another word for fexofenadine, it's terfenadine acid metabolite. It's just another way of saying fexofenadine. But how can you say that the chemical process which they use in the selective crystallization or whatever, was intended to affect anything other than separating the Meta and the Para intermediates? I'm sorry, which pre-crystallization am I talking about? Well, you recited all of these other steroids, lipids, fatty acids, and so on, as being impurities. Yes. But their process doesn't relate to any impurity, does it? Other than eliminating the Meta isomer. No, but when they then say at the bottom, at the end of that paragraph, in the next short paragraph, they point out that because those impurities were present at greater than 2%, it was not substantially pure. So they were saying any impurity that gets you above 2% renders it not substantially pure. And when the Board of Appeals issued its decision, they also ruled on page 1668, based on what the AMBER applicant had asserted. In paragraph 27, they say, a person of having ordinary skill would interpret the phrase substantially pure in the context of the AMBER patent to mean no more than 2% impurities. They didn't limit that to the Meta impurities. But aren't they talking about the end product there? The effects of phenidine and not the intermediate? No, because again, they're talking about all the claims. Let's remember, claims 12 to 17 of the 610 patent didn't use the word substantially pure at all with respect to the end product. It only used it with respect to the ParacPK intermediate. So, when they said substantially pure and defined it as to all the claims, there's no question they were talking about all the claims. I just wanted to read you a statement that was made by the AMBER applicant on page A1632 of the appendix. And to me, this is unequivocal. I don't understand how you can say that this does not make a clear statement. It says... That's the passage that I began. I believe so, yes. But it's worth focusing on because it says, when read in light of the specification, which is the same spec we have here, they're all a common spec,  the phrase substantially pure as used in claims 1 to 17 of the AMBER patent. Now, again, in claims 12 through 17, the only usage of substantially pure is for the intermediate. They don't talk about the end product in 12 through 17. So, somebody reading this is certainly entitled to take away from this that they're talking about substantially pure as used not only for the end product, but also the intermediate product. Do you know offhand whether... I mean, the board makes a reference in the testimony of Dr. D'Ambra. Do you know if... I didn't see that in our appendix. Do you know if that was part of the record in this case? Or do you know what Dr. D'Ambra said? Because it seemed to me, since the board comes to the conclusion one would infer from the testimony of Dr. D'Ambra and others that substantially pure means 2% in the context of the D'Ambra patent. It might be useful to know exactly what it is that he said. I'm not sure if they literally meant he said or if they were referring to these arguments that were made in the... I don't know. They specifically said that they are qualified to give testimony and opinions and I quote, set out in their respective affidavits or declarations. So, presumably there's an affidavit or declaration from Dr. D'Ambra. Certainly correct. I agree with that. I don't know if it's in the record. I don't know if it's in the record. I know it's not in the appendix. I don't know if it's in the record. I know it's not in the appendix. I believe most if not all of the 610 prosecution was in the record but I'm not 100% sure. Sorry. Let me come back again to the point. I want to make sure I understand where you are because this may turn out to be an important point in the case. Your position as I understand it is yes, you think that substantially pure means the same thing with respect to the hexapyridine compound but if we were to say that substantially pure with respect to the regioisomer means substantially pure vis-a-vis the para and meta regioisomers, not with respect to other components of the mixture. Nonetheless, you don't infringe so that's not an issue. I understood what you said in response to my question earlier. That's not an issue on which this case turns. Is that correct? I'm hesitating because I believe that the court should reach the question. I understand that you don't want us to do that but my question is if we should do that, does that matter to the disposition of this case? Mr. Burkhoff seemed to think it does and you earlier seemed to say no it doesn't and I want to make sure that we at least have each party's position on that. I'm advocating below the position that it doesn't matter. I understand. If Mr. Burkhoff prevails on some of his arguments it may matter. I don't want to say unequivocally there's no need to reach that question because it does not affect the outcome under any circumstances. I'm not prepared to say that. I understand where you are. Is that fair? That's fair. Thank you. Thank you. Again, I think that if you look at the context and I just want to again go back to the patent just for one minute and then I'll sit down but if we could just, I want to go to the point that we discussed a minute ago and I didn't get a chance to finish that. Judge Bryson was absolutely right. Again, you have to look at what this whole invention is about. Mr. Burkhoff again said that there were instances disclosed in this patent where piperidine derivatives are described that are not substantially pure. I emphatically disagree. Everywhere when they start and they say the invention is about substantially pure piperidine derivative end products. The question is what it's pure of. Well, true. As you can see, that's what's bothering me. I understand that, but I dispute the fact when Mr. Burkhoff said, well, part of this invention covers starting with a substantially pure and getting to a less than substantially pure piperidine derivative end product. Anybody reading this patent cannot possibly walk away with that belief. Anywhere they refer to something called the piperidine derivative end product, and there are certainly places like that, it's very clear that the antecedent is the substantially pure piperidine derivative end product. Let me just refer you to two passages in the 703 patent that I would like you to have a look at. You mean the substantially pure intermediate or you say the antecedent is itself? No, when they talk about the piperidine derivative end product without using the word substantially pure. The final product. It's clear that the antecedent for that piperidine end product is the reference to the earlier reference to the substantially pure end product. So you're saying it's just a short form. Exactly. They're shorthanding it, and it's very clear from the spec. If you would look on, for example, page, after they talk at the very beginning of the detailed description in column 6, the first line says, the present invention relates to substantially pure piperidine derivative compounds of the formula, and then it gives the end products that are the end products of the claims. Then it says, after going through all the various piperidine derivative products you can have, it says the piperidine derivative compounds of the present invention, and they say they just told us the ones of the present invention are substantially pure, are prepared by providing a substantially pure regioisomer of the following formula. So they tell you that to get to the substantially pure piperidine derivative end product, you start with a substantially pure regioisomer, which is this paracPK. Yes, but they're not talking about all of the other things that  mix. You're focusing on the issue of other impurities, and I understand that. I don't understand, it says pharmaceutical grade, but an intermediate doesn't have to be pharmaceutical grade. The intermediate, it seems quite clear, they're saying, we finally figured out how to get rid of the meta-impurity in the final product by getting rid of it in the intermediate product. Yes, I understand what you're saying, and I think the answer that we have to that is that having defined, having concluded that the word substantially pure is used consistently throughout to refer to both the intermediate mixtures and the final product, and having defined the final product as 98% pure with respect to all impurities during the 6-10 interference, that definition must by necessity bind the definition of substantially pure as applied to the intermediates. And the fact that they could have done something different and treated it differently and made clear there was a distinction, yes, they could have done that, but they didn't. But they're not drawing a distinction as far as the meta-impurity is concerned. This is what troubles me. That finally, if you have something which needs to be administered pharmaceutically, certainly you need to get rid of all the other stuff that might have been involved in the assorted chemical reactions to get to this final complex compound. But if actually, as seems to be the case, that the relative meta and para is the same in the intermediate and in the final product, that when they get rid of the meta-impurity in the intermediate, that's how they get rid of it in the final product that's there. I agree with that. So I'm trying to understand how to get from there to your saying also that since the final product also as pharmaceutical grade can't have any of these other funny things in it that are mentioned, like the lipids and so on, that therefore the intermediate also has to not be contaminated, if you call these contaminants. Because it seems to have nothing to do and when you said when we started out that you're using the car process and none of this matters anyway, then that makes me think that perhaps these other contaminants that have crept in, if they in fact are due to their crystallization rather than the car process, that again it's more complicated than what each of you is telling us. Well firstly, when you say their crystallization method, there is no crystallization method discussed in the patent. Right? They talk about it being inseparable once you get to a certain point. So they never talk about taking the product and cleaning it up through crystallization. The final product. Yeah. No, they clean it up in the intermediate. That's not a chemical process either, is it? Excuse me? That's a mechanical process, not a chemical process. No, it's a precipitation process. I think it is a chemical process. I think you precipitate out the impurities, is the way it works, I believe. But they purify the intermediate, and this is what I'm really trying to understand, by getting rid of the meta-contaminant. And I gather that that's not disputed? That the patent does that, that they do that? Yes, I can see they do that. And that the same meta-power ratio then in the purified intermediate is what carries over to the final product. That's my understanding of this patent. That's exactly what they do. That's correct. So that whatever it is that is substantially purified in one, indeed, applies to the other. But that what it's purified of is the meta- contaminant, and not all of the other things that might affect... I do understand what you're saying. I follow you completely. I understand you're making the distinction between is it just the meta-power in the intermediate as opposed to also the other impurities that might be present, such as other compounds, whatever. And the meta-power in the final product. Right. And so my answer to that is simply that having used the word substantially pure, applied indiscriminately to the intermediate and the final product, and having defined that term in the interference to mean something, under the case laws I understand it, you've got to apply that definition then also to all the contexts in which it's used. And that is further strengthened by the fact that when they define substantially pure in the interference, let's remember there were claims 12 to 17 which only use substantially pure as applied to the para-CPK intermediate. So when they said substantially pure means as applied to claims 1 to 17 in the interference, they must have been talking about it as to all. If they didn't intend that, there were a million ways they could have made that clear. We're only talking about as applied to the end product, not the intermediate. Did they do any of that? No. They said substantially pure as used in claims 1 to 17 applies and means the following, and they said it was 98% with respect to all impurities. And having said that, I don't see how they can just walk away from that. And we should just take a quick look. Can we look at 610? The PTO in the memorandum at A1559 says that their reference was to focus on claims 1 through 7. So they were directed by the PTO to focus on those particular claims. Where are you A1559? Begin at the middle of the top paragraph. Well, they say, as I read it, they're saying that the product by process claims don't provide a limitation distinct from the claims of 1 to 7. I don't think they said you only have to focus on claims 1 to 7. And again, the applicant said substantially pure as used in claims 1 to 17. Those were their words. Nobody forced them to make that statement. That was a statement that they made. And again, just take a quick look at page A1550, if you would. At the bottom of the page in the right-hand column starting at column 26, line 50, claim 12 is reproduced. And just let's look at that claim. It says a piperidine derivative. It doesn't say a substantially pure piperidine derivative. That's the end product. It says produced by a process comprising and then says providing a substantially pure regioisomer of the formula. That's the exact language that appears in claim 1 of the 703. Providing a substantially pure regioisomer of the formula. And then the claim goes on and it never uses the word substantially pure. It continues in column 27. Never uses the word in the context of the end product. It again repeats at line 8 talking about converting the substantially pure regioisomer. So claim 12 is only limited to the substantially pure as applied to the regioisomer. The regioisomer is what substantially pure not everything else in the bucket or in the test tube. Right, but later on I think that that's why I pointed to that language later on at 1648 of the appendix where in distinguishing over the art, they used the word substantially pure to distinguish and said because that thing has other impurities that bring its impurity level above 2%, it's not substantially pure. So they took the position that substantially pure as applied to the end product certainly meant it couldn't have more than 2% of all impurities. That's where Judge Brown got his construction from. And having, again for the reasons I've indicated, having said that substantially pure means the same thing for the intermediate and the end product it seems to me they're bound by that. And they can't just walk away now and say well we could have done this or we could have done that or you could make a process this way or you could have done this and it's really not important in the intermediate because you can get it out another way at the end. That's not what the record shows. They define the term. Under the CAR process and that's what you're practicing, correct? Yes, sir. Do you get to an intermediate radioisomer state? You don't, do you? Well we do, but we use the CAR intermediate which is not that power CPK. So the answer is yes. And what's the purity percentage in that? Ah, calling my memory here from the litigation, but I believe it's about 55-45 if I remember correctly. So then after you use that radioisomer at 55% and then that's where you convert it using the perpidine derivative, that's the next process in the CAR? Yes, we go to the end product. Our end product, just to be clear let me say two things about it. At that intermediate point, let's call it an intermediate because it's right before you combine it or bond it with a perpidine you're saying you're at 55%. Para versus meta. Roughly in there, yes. So you don't have to have a 98% pure para PC CPK in order to move on to the next step, which is bonding that with the perpidine derivative. Correct, exactly right. And let me make just two points on that. While they initially took the position, as you saw in the background art section, that CAR only could get to like, I think it was what, 33-67, we looked at that in column 4. The reality was, even during this prosecution, when they actually analyzed CAR, they figured out that CAR had gotten all the way up to 96.3%, that's in the prosecution because he recrystallized. And what he did was, after he got to the end product, he figured out a way to get the meta out. They were just wrong about that. You can separate out the meta. They said you can't separate out enough. They make this point. If you look on page 15, let me just, this is I think worth looking at real quickly if you don't mind. Isn't their invention limited to separating out the meta at the intermediate stage? Yes, absolutely. Whether or not you can separate it out at the final Pipperdine product? Yes. My only point was that they believed you couldn't do it, and it turns out that you can do it, and that's what we do. That was the point I was making in response to Judge Raymond's question. If you look at 1531 to 1532 of where they were prosecuting the prior application, that was the 703 issue from the continuation of this, but it was the same claims they were arguing. And they make the point that CAR, now they acknowledge that CAR can have a recrystallization treatment, but they say even after such treatment, it still contains an impurity level of up to 5%. So they recognize that you can do it, contrary to what they thought. During the prosecution, it became apparent to them. They did some experiments. They tested. They had some of the CAR material, because it was their own. CAR was, by the way, one of their employees of one of their predecessor companies, and so they had that material. They tested it, and they found out it was, in fact, a very high purity level. So, again, that's what we do. We have actually improved on the CAR crystallization process. We've made it even better, but essentially we follow that technique. We make the final product, and we recrystallize. Now they, that's how we do it. Any more questions? I'm sorry that I went on so long. No, it's all right. Thank you, Mr. Devane. Thank you very much. Mr. Berghoff. Thank you. I'd like to return to Judge Bryson's initial line of questioning of me, and I want to give a better answer. And I apologize that I didn't give a better answer the first time around. Wisdom is welcome, whether it comes late or not. Thank you. We're looking at the very page you were focused on, Your Honor, A1632. And let's look at what was actually said, because your affilies put a great deal of reliance on this sentence, and Your Honor did as well. I'm starting from the second paragraph under the heading, Summary of Argument. When read in light of the specification, one skilled in the art would have understood that the phrase substantially pure, as used in Claims I through XVII of the D'Ambra Patent, to mean that the subject compound has pharmaceutical-grade purity. And I forgot about that, Your Honor, in my initial talk. And is in a form purer than that attained by the prior art, the Carr Patents. Well, when they say subject compound and then talk about the purity being greater than Carr, Carr only produces fexofenadine. Carr does not have CpK. This sentence cannot be talking about the purity of the intermediate, the substantially pure regioisomer CpK. This was focused on the subject compound, and it's the subject compound because it's the subject of the interference. And that was, who was the first to invent substantially pure fexofenadine. So this, I believe, as Apollese would have it, a damning statement that substantially pure... What do you believe that the term is in a form purer than that obtained by the prior art? What's that referring to? Well, is that the fexofenadine is purer than that obtained by the Carr Patent, the prior art process for making fexofenadine. That's exactly what that is referring to. So it's referring just to the fexofenadine. Just to the fexofenadine because that's the subject compound, that's the subject of the interference, and it can't be referring to CpK because Carr doesn't make CpK at all. So it can't be referring to the intermediate. So I think that responds to that. Well, what about D'Ambra's declaration? Is that in the record? The one that's referred to in the interference? I don't believe it is. And I'm in the same position. I mean, you see what I'm pointing to. The reference in 1668 to D'Ambra, Okerholm, and Leskovick. Of course, we have Leskovick's declaration, but it appears that we don't have the other two. Is it in the record? You know we have these rules that you can't put things in the record. My question is is it in the record at all? If it's not in the record at all, it's not open to us, and neither council seems to know if it's in the record. Well, we'll find it if it's in the record. I don't know. So that's one point. A second point is that the district court, Judge Brown, found that the phrase piperidine derivative in the claim at issue in the 703 patent simply means a piperidine derivative and is not limited as to purity, and there's been no argument about that in this case. This claim is directed to a process of making fexofenadine of any purity, and that's what the district court found, and I don't believe that's open to argument at this point. Well, the but as your opposing counsel pointed out, the patent says on several occasions that it is directed to a substantially pure fexofenadine. Yes. Which, I mean, I upon the range of presence that's your position. And the district court agreed with that position, and the argument here is that what does it mean when the claim refers to substantially pure regioisomer? And the final point I'd like to make, borrowing other questions from your honors, is that the specification refers to one and only one thing when it describes something as a substantially pure regioisomer. The specification refers only to the intermediate compound that is the heart of Dr. DeAmbra's process invention in this case. The references, as Judge Reina correctly pointed out, in columns three and four of the specification in A-76 are to the prior art process, and I think even more importantly, those references are telling us what is not a substantial pure regioisomer. The only thing that is identified as a substantially pure regioisomer in the text of the specification is CPK. And so the idea that those statements somehow equate to and require a finding of pharmaceutical grade purity for an intermediate when that's not required by the structure of Claim 7, which lets you make impure as well as pure, and would be contrary to the understanding of a person of ordinary skill in the art who knows you don't have to have your intermediate as pure as your final pharmaceutical grade product. Do you have... I'm sorry. No, no. You finish your thought. I didn't mean to interrupt. The only other conclusion on that was going to be that in fact, the specification does show purification of fexofenadine after the big reaction is carried out with the CPK. And that's in Example 7. And this is the example where fexofenadine is made, and this was the specific detailed example from Dr. DeAndre's laboratory work. And there's a lot of chemistry here, and I'll try not to belabor it, but we go to the end of that example, and it starts out the crude product was dissolved in methylene chloride, etc. The crude product is fexofenadine at that point. But it's still crude. At that point, but Mr. Prevent said that their intermediate is 55-45. That's a different dispute. They say they're using the prior art process. We have evidence they're not. They are in fact over in a foreign country in their plant using our patent process. That's a different dispute. I'm not sure whether you're asking us to interpret whatever usage of substantially pure is we may conclude is correct to include anything? Oh, no. We believe it's only the meta-isomer. That's all that's focused on. The only impurity that's ever mentioned. But my only point here is that this example tells you that after you do the reaction, the patented process reaction, you get a crude product. That's fexofenadine. You still have to clean it up, as you do with any chemical process. It talks about how it's done. It's put on a chromatography column. It's eluted with some solvents. The after you go through these purification steps, you end up with the white crystals that are pharmaceutical grade. Our process makes crude product, crude fexofenadine, and that is covered by the claims, and therefore the intermediate shouldn't be limited to this too high, too stringent of a standard that is not found anywhere in the specification. Note there's no mention of 98% purity in the specification, and there is no mention entirely in the prosecution history of any required purity for the intermediate chemical. I do have one other question. If you have the patent in front of you, column 4, once again, the very top, the figure at the very top of column 4, I take it is the fexofenadine without specifying either the para or meta regioisomer, correct? And that is the third mixture of regioisomers as you characterize it in the patent. So when you say the second and third mixture of regioisomers has not been possible to obtain in substantially pure form, even though you're using the term regioisomer, you're referring to the final product, what you elsewhere refer to as the papiridine derivative compound, correct? Yes, that's correct. And you use the term substantially pure. Yes, that is correct. No further questions? No more questions? Thank you. Thank you both. All rise.